# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| In Re: | ) |
| | ) |
| **ROBERT FLETCHER STANFORD, SR.** | ) **Case No. 19-01846-TOM-7** |
| and **FRANCES SHARPLES STANFORD,** | ) |
| | ) |
| Debtors. | ) |

| | |
|---|---|
| **THOMAS E. REYNOLDS,** | ) |
| | ) |
| Plaintiff, | ) **A.P. No. 21-00031-TOM** |
| vs. | ) |
| | ) |
| **AXOS BANK, WORLD BUSINESS** | ) |
| **LENDERS, LLC; and WBL SPO I, LLC,** | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

This adversary proceeding came before the Court on June 10, 2026, for a hearing pursuant to the Order of the District Court dated September 9, 2025 (Doc. 143) vacating this Court's Memorandum Opinion and Order entered on November 21, 2024 (Doc. 111) and remanding the adversary proceeding. Appearing before the Court were Bill Bensinger and Elli Anne Bradley, attorneys for Plaintiff Thomas E. Reynolds as Chapter 7 Trustee (the "Trustee" or "Plaintiff") for the bankruptcy estate of Robert Fletcher Stanford, Sr. and Frances Sharples Stanford; and Jay Haithcock, counsel for Axos Bank ("Axos"), World Business Lenders, LLC ("WBL") and WBL SPO I, LLC ("SPO") (Axos, WBL, and SPO, collectively, the "Defendants").[1] This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 151, and 157(a), and the District Court's General

---

[1] Based on no written objections having been filed and no verbal objections having been voiced at any hearings in this adversary proceeding, all parties and their counsel have implied their consent and thus will be deemed to have consented to entry by the Bankruptcy Court of any and all final orders and judgments in this adversary proceeding.

Order of Reference dated July 16, 1984, as amended July 17, 1984.[2] This is a core proceeding arising under Title 11 of the United States Code as defined in 28 U.S.C. § 157(b)(2)(H).[3] The Court has considered the pleadings, the arguments, and the law, and finds and concludes as follows.[4]

### FINDINGS OF FACTS[5]

This adversary proceeding is before the Court on remand from the District Court for the Northern District of Alabama. After a trial on the Trustee's Complaint, this Court issued a Memorandum Opinion and Order (Doc. 111) on November 21, 2024. The Defendants filed a Notice of Appeal (Doc. 115) on December 4, 2024, and the Trustee filed a Notice of Cross-Appeal (Doc. 121) on December 6, 2024. In its Order of September 9, 2025 (Doc. 143), the District Court vacated this Court's Memorandum Opinion and Order and remanded the case, instructing this Court to particularly determine whether the Debtors in the underlying bankruptcy case and their business shared an identity of interests, and whether the question of identity of interests is relevant if this Court determines that the Debtors' business, at the time it received a loan from Defendants, was insolvent.

---

[2] The General Order of Reference Dated July 16, 1984, As Amended July 17, 1984 issued by the United States District Court for the Northern District of Alabama provides:

> The general order of reference entered July 16, 1984 is hereby amended to add that there be hereby referred to the Bankruptcy Judges for this district all cases, and matters and proceedings in cases, under the Bankruptcy Act.

[3] 28 U.S.C. §157(b)(2)(H) provides as follows:

> (b)(2) Core proceedings include, but are not limited to–
> . . . .
> (H) proceedings to determine, avoid, or recover fraudulent conveyances[.]

[4] This Memorandum Opinion and Order constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to adversary proceedings in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052.

[5] Pursuant to Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of the contents of its own files. *See ITT Rayonier, Inc. v. U.S.*, 651 F.2d 343 (5th Cir. 1981); *Florida v. Charley Toppino & Sons, Inc.,* 514 F.2d 700, 704 (5th Cir. 1975).

On May 3, 2019, the Debtors filed a Chapter 11 case for their business, American Printing Company, Inc. ("APC"). Also on May 3, 2019, the Debtors filed their personal Chapter 11 bankruptcy petition.[6] APC was a commercial printing company located in Birmingham, Alabama. Mr. Stanford, who served as the president and CEO of APC, testified that by January 2019 APC was not profitable, and that the Debtors themselves owed liabilities that exceeded their assets.

In fact, Mr. Stanford testified that APC was in financial "trouble long before 2019." Tr. Vol. 1, 49:13.[7] Don Wright, an accountant and former CFO of APC, testified that in probably February or March of 2017, secured creditor ServisFirst Bank ("ServisFirst") wanted Mr. Wright to serve "as a consultant to come in and help with the financial management of [APC]." Tr. Vol. 1, 135:22-23. Mr. Wright explained that when he first went to APC he was paid by ServisFirst, and at that time the company's finances were "abysmal." Tr. Vol. 1, 136:7. In fact, he testified that during the course of his time at APC he used his personal credit cards to buy $900,000 of paper and other supplies for the business because APC did not have the funds. He was eventually reimbursed for all but $40,000.[8] While Mr. Wright was originally compensated by ServisFirst, at some point he became employed directly by APC. He explained that since he would hopefully be turning APC around he wanted some ownership of the business, and on August 15, 2018, the Stanfords transferred 25% of the shares in APC[9] to Mr. Wright for no monetary consideration. Def. Ex. 1. At that time Mr. and Mrs. Stanford owned 100% of the shares. *Id.*

---

[6] The Stanfords' individual bankruptcy case was converted to Chapter 7 on March 15, 2021, and at that point Mr. Reynolds, the Chapter 7 Trustee, became involved. APC's bankruptcy case, 19-01844-TOM-7, was earlier converted to Chapter 7 on May 5, 2020. Andre' M. Toffel served as Chapter 7 Trustee in APC's bankruptcy case. APC's case was closed without any distribution to creditors.

[7] References to "Tr. Vol. 1" are to the interes transcript of February 5, 2024, the first day of the trial in this adversary proceeding. Likewise, references to "Tr. Vol. 2" and "Tr. Vol. 3" are to the transcripts of February 6, 2024, and February 7, 2024, respectively. Page numbers and line numbers are indicated by, for example, "136:7" referencing page 136, line 7 of the transcript.

[8] Mr. Wright eventually was paid $40,000 by Mr. Stanford in exchange for Mr. Wright's shares in APC. *See infra.*

[9] The Stock Purchase Agreement provided that Mr. Wright could eventually receive up to 35% of the APC shares, which he did at some point. Def. Ex. 2; Tr. Vol. 1, 81:15-17.

In December 2018, Mr. Stanford started looking for financing for APC to keep the company going. Mr. Stanford, for APC, contacted Republic Business Credit ("Republic") and Alantes Corporate Finance ("Alantes") to explore long-term financing, and Alantes referred Mr. Stanford and APC to WBL, a servicer for Axos, for a short-term bridge loan. Tr. Vol. 3, 25:21-26:10. On December 26, 2018, Mr. Stanford submitted a Business Loan Application for APC to WBL for a loan in the amount of $350,000 (the "Application").[10] Def. Ex. 3. WBL required that the Stanfords, as owners of APC, be guarantors of the debt. Tr. Vol. 1, 19:22-20:2. *See also* Def. Ex. 4, at 8. WBL would have required a guaranty from Don Wright as well, but as Mr. Stanford testified, Mr. Wright did not want to do so. Tr. Vol. 1, 20:3-5. Thus, Mr. Stanford had APC purchase the shares owned by Mr. Wright for $40,000, the approximate amount still owed to Mr. Wright by APC for purchasing supplies for the business.[11] Tr. Vol. 1, 2:7-20. In addition to being guarantors, the Stanfords were required to pledge personal collateral to secure their guaranty to APC. They agreed to grant a mortgage to WBL on an unencumbered condo they owned in Florida (the "Florida Condo") that Mr. Stanford believed to be worth $375,000 at the time, according to his testimony.

During the trial, counsel for the Defendants asked Robert Pardes, president of WBL, about WBL's business and market, and the relationship between WBL and Axos:

> Q        Describe for the Court what WBL's business is and what their market is.
> A        Sure. WBL is an alternative business lender, which is a genre assigned to lenders that are largely noninstitutional, private lender, and are not bound by institutional credit guidelines. Typically, the loans are short term, so I think another name for WBL could be – another category could be called bridge lending or bridge-loan lending, which are essentially short-term loans . . . .
> . . . .

---

[10] Mr. Stanford testified that when APC originally applied, WBL offered APC a loan of $50,000. On behalf of APC, Mr. Stanford turned down the offer because he believed the amount would not have been helpful.

[11] The funds used to purchase Mr. Wright's shares came from the proceeds of the loan

Q       Since we have not yet discussed the relationship between WBL and Axos Bank, will you describe the relationship that existed as of February – I'm sorry, as of the time period; I guess, the application was 12/16/2018.[12]

A       Sure. WBL was a service provider for Axos Bank, sourcing borrowers on a wholesale basis. . . . [WBL reaches] out to advisors to businesses, who – or brokers, who then refer the clients. Those clients are then referred to Axos Bank, but the process also involves WBL performing all the services essential to intake, which is taking the application, collecting the information, processing the information, underwriting with Axos' approved guidelines, and then,  ultimately, submitting – submitting it first to – with a recommendation to our internal credit committee, and if approved by internal credit committee, submitting it to Axos at that time – submitting it to Axos Bank for their credit approval – their approval for funding.

Tr. Vol. 2, 152:17-25; 157:10-158:2. Mr. Pardes testified that "a large proportion, like thirty or forty percent, of our guarantors are what we would classify as subprime," including the Stanfords. Tr. Vol. 3, 14:2-6.

Mr. Pardes explained that WBL required bank statements, guarantors' credit reports, information on the value of collateral, a social media search, and an attorney opinion letter, among possibly other things, as part of the loan process. WBL did not require, and never asked for, financial statements from either APC or the Stanfords. Mr. Pardes testified that WBL prepared an "underwriting analysis" that it sent to Axos. *See* Def. Ex. 7. During his testimony Mr. Pardes referred to a "credit report" contained within the underwriting analysis, explaining that consideration of the Stanfords' credit was not based on a credit score, but instead was "trade-line based," such as whether the Stanfords had trade-line delinquencies. Tr. Vol. 3, 10:4-5. According to Mr. Pardes, the Stanfords had "no delinquencies,"[13] Tr. Vol. 2, 169:6-9, which was better than

---

[12] The trial transcript of February 6, 2024, on page 157, line 13, reflects that Mr. Lassiter, counsel for the Defendants, referenced APC's application date as being "12/16/2018." Tr. Vol. 2, 157:13. At other times during the trial, however, the application date is identified as December 26, 2018. *See, e.g.*, Tr. Vol. 2, 156:3-4. The Business Loan Application itself is dated December 26, 2018. Def. Ex. 3.

[13] Mr. Pardes referenced a section on the fifth page of Defendants' Exhibit 7 titled "Principal and Guarantor Credit Analysis." As to each Mr. Stanford and Mrs. Stanford, six categories of debt are listed with "high credit," "balance," "past due," and other figures provided for each category. The "past due" columns for both Mr. and Mrs. Stanford total $0. Def. Ex. 7.

WBL's average guarantors. It is not clear from Mr. Pardes's testimony, however, what he meant when referring to "trade lines."

On cross-examination, Mr. Pardes was questioned about another Stanford credit report, one prepared by CoreLogic Credco and pulled by WBL. Def. Ex. 97. This credit report contains, among other things, credit scores from Equifax, Experian, and TransUnion. *Id*. In response to questioning from counsel for the Trustee, Mr. Pardes testified:

> Q    Do you see there, kind of in the bottom quarter of the page it says, "Data sources score information".
> A    Yes.
> Q    And in that first box, it says – in the middle, it says that "there is serious delinquency; proportion of balances to credit limits is too high on bank revolving or other revolving accounts; too few accounts currently paid as agreed; and amount past due on accounts". Did I read that correctly?
> A    Yeah. But – yes you did, except that it doesn't correspond to the data that's in the report. So we – we don't – we look at the trade lines. If the trade lines aren't delinquent, then that's just information. It's -- it's information that's algorithmically generated. I have no idea what the black box says. Most Americans don't know what the black box says. That's why we don't rely on credit scores.

Tr. Vol. 3, 11:21-12:10.[14] Presumably, Mr. Pardes was comparing the information in the CoreLogic credit report to the information in the underwriting analysis when he referred to the "data that's in the report," but again, his testimony was not clear.

The loan to APC was eventually approved. Mr. Pardes testified that WBL valued the Florida Condo at $320,000, which factored into the decision to offer APC the loan amount of $244,000. Under the loan terms, the loan was to be repaid through weekly payments of $6,160.52 with interest accruing at a rate of 77.3355% per year. Pl. Ex. 1; Tr. Vol. 3, 40:20-22. In terms of dollars, APC would repay $96,346.68 in interest for a total amount to be paid of $320,346.68. Pl. Ex. 2. The loan would mature on February 26, 2020 by its terms but APC could pay off the loan

---

[14] When asked what he meant by the "black box," Mr. Pardes explained "[o]h, the – the – the credit reporting agency, they – they have some kind of algorithm that takes data in the public records and then gives a score. And those comments are in there as to the rationale for their score. . . ." Tr. Vol. 3, 12:14-17, 22-23.

early. Pl. Ex. 1. However, doing so would not result in savings for APC or the Stanfords. As part of the loan, APC executed a "Prepayment Disclosure" statement providing that an early payoff would require payment of a "prepayment premium." Def. Ex. 18. As explained in the Prepayment Disclosure, the prepayment premium would be "the remaining interest you would have paid on the loan through the loan maturity date" or, as illustrated in an example, "if you still have remaining interest payments of $50,000 through the maturity date of the loan . . . then the prepayment premium would be $50,000." *Id.* Thus, whether it is called interest, a "prepayment premium," or something else, the additional $96,346.68 over the principal amount would have to be paid regardless.

On February 25, 2019, APC executed the Business Note and Promissory Agreement (the "Note") to Axos in the principal amount of $224,000, to be repaid along with the $96,346.68, whether it be considered interest, a prepayment premium, or a combination of the two.[15] Pl. Ex. 1. For their part, the Stanfords executed the Continuing Guaranty, Personal (the "Guaranty"), and a Mortgage, Assignment of Leases and Rents and Security Agreement (the "Mortgage") pledging the Florida Condo as collateral for the loan. All documents were dated February 25, 2019. Pl. Exs. 3, 4. Subsequently, Axos sold the Note, Mortgage, and Guaranty to WBL on March 4, 2019; in turn, WBL sold and assigned the loan documents to SPO, a wholly owned subsidiary of WBL, on March 4, 2019. Def. Ex. 26; Tr. Vol. 2:189:18-23, 191:18-23.

Out of the loan proceeds, $40,000 went directly to Mr. Wright for his shares of APC, while another $1,605.63 were used to pay the delinquent property taxes on the Florida Condo. Pl. Ex. 2. Additional proceeds were used to pay the closing costs and fees, leaving $178,384.87 net loan

---

[15] The Note does not mention the $96,346.68 figure anywhere. Instead, it contains a somewhat complicated formula for calculating the amount due upon prepayment in paragraph 4, "Voluntary Prepayment and Prepayment Premium." The $96,346.68 figure is taken from the Prepayment Disclosure that describes the prepayment premium calculation in a much simpler manner. *See* Def. Ex. 18.

7

proceeds that were deposited into APC's account at Southpoint Bank (the "APC Southpoint Account") on February 27, 2019. Pl. Exs 2, 6; Tr. Vol. 2, 6:7-13. Mr. Stanford testified that at the time the loan was made he was the president of APC, oversaw its operation, and had signatory power for APC's bank accounts. Tr. Vol. 1, 79:20-80:4.

The alleged use of the loan proceeds was covered in detail during the trial. Mr. Stanford testified that the loan was obtained for the purposes of making payroll and covering expenses. The loan proceeds were deposited into the APC Southpoint Account, but other funds were in the account at the time the loan proceeds were deposited, and deposits from other sources were made thereafter. Def. Exs. 31-34. Defendants' counsel questioned Mr. Stanford about checks and wire transfers that were made to Mr. Stanford, Mrs. Stanford, or a Chase credit card[16] in Mr. Stanford's name.[17] Def. Exs. 31-34. Counsel covered such transactions from the date the loan proceeds were deposited through May 2019; however, the March 31, 2019 APC Southpoint Account statement reflects that on March 13, 2019, the account had been overdrawn, leaving a balance of -$393.23. Def. Ex. 32. According to the testimony and exhibits, the following transactions took place between February 27, 2019, through March 13, 2019:

| Feb. 27th | $3,000 | Payment to Chase card in Mr. Stanford's name |
| Feb. 27th | $6,000 | Wire transfer to Mr. Stanford |
| Feb. 27th | $21,000 | Wire transfer to Mr. Stanford |
| Mar. 1st | $3,000 | Payment to Chase card in Mr. Stanford's name |
| Mar. 5th | $2,000 | Direct transfer to Mrs. Stanford |
| Mar. 6th | $5,000 | Payment to Chase card in Mr. Stanford's name |
| | $40,000 | Total payments to the Stanfords and the Chase card |

---

[16] The Chase card was also used for some business expenses according to Mr. Stanford's testimony.

[17] Counsel for the Defendants also asked Mr. Stanford about approximately $43,000 moved from the APC Southpoint Account to an account APC had at Servis1st (the "APC Servis1st Account") prior to March 13, 2019. Defendants' counsel further asked Mr. Stanford about payments to the Chase card totaling $15,000 made from the APC Servis1st Account after this deposit. *See infra* note 30.

Def. Exs. 31-32. Mr. Stanford acknowledged receiving three checks in the amounts of $4,301.34, $4,301.34, and $4,301.32, between February 27 and March 13, that were payroll checks for his wages. *See* Ex. 116.

The subject of paying APC employees was raised briefly a few times at trial. Defendants' counsel elicited testimony from Mr. Stanford that a major purpose of the loan was to enable APC to meet its payroll obligations. Mr. Stanford agreed that paying employees was important to retaining employees to complete jobs for clients and, in turn, bring in revenue for APC. Tr. Vol. 1, 258:3-14. Employee payments were also brought up during a lengthy discussion in response to an objection by the Trustee's counsel. Defendants' counsel contended that the loan proceeds allowed APC to continue operating, providing a means for payments to employees who would in turn keep working to finish jobs.

The parties submitted into evidence an exhibit in which they stipulated that payroll checks in the total amount of $124,387.24 were drawn on the APC Southpoint Account between February 27 through March 13, 2019.[18] Def. Ex. 116. This figure included the three payroll checks to Mr. Stanford. *Id.* The payroll expense increased to $270,060.03 when the entire month of March 2019 is included. *Id.*

APC made its first payment on the loan on March 6, 2019, and ultimately made seven weekly payments of $6,160.52.[19] Def. Ex. 27. In total, APC paid $43,123.64 toward the loan. According to Mr. Stanford's testimony, APC could not really afford to make the payments, and he realized that "from the beginning." Tr. Vol. 1, 31:23-32:6. Thus, in order to pay the loan, the Stanfords put the Florida Condo up for sale. On April 25, 2019, the Florida Condo sold for $360,000. Pl. Ex. 20; Tr. Vol 1, 33:1-2. From the closing of the Florida Condo, $275,988.28 of

---

[18] This $124,387.24 represents roughly 70% of the loan proceeds.
[19] APC actually tendered eight payments but the eighth was returned NSF. Def. Ex. 27.

9

the sale proceeds were paid to SPO[20] to pay off the APC loan, which included principal of $202,665.40, accrued interest of $3,346.14, and a prepayment premium of $69,976.74.[21] Pl. Ex. 19. Together, APC and the Stanfords paid $319,111.92 on account of the loan.[22] For the sake of simplicity, the Court will use the round figure of $320,000 for its analysis in this Memorandum Opinion and Order.

Mr. Denaburg, a certified public accountant, credibly testified that he was retained by the Trustee to perform an insolvency analysis of the Debtors as of February 25, 2019.[23] According to his testimony and written insolvency analysis (Pl. Ex. 16), he reviewed the Debtors' bankruptcy schedules, the claims filed in their bankruptcy case, and their tax returns from 2018 and 2019, among other things. Mr. Denaburg explained that he started with asset values and liabilities given on the Stanfords' bankruptcy schedules then adjusted the values up or down based on further investigation and review of new information.[24] Mr. Denaburg's findings were detailed in an insolvency report admitted into evidence. Pl. Ex. 16. Considering all of the Stanfords' assets and liabilities as of the bankruptcy date, Mr. Denaburg determined that the Stanfords were insolvent, as their liabilities exceeded their assets by a range of $9,000,000 to $10,500,000. *Id.* When questioned whether liabilities in excess of assets equals insolvency, Mr. Denaburg explained:

> Q      Who came up with the idea that when liabilities exceed their assets that renders someone insolvent? Was that you, or was that the request for Mr. Bensinger?

---

[20] By this time the Note, Guaranty, and Mortgage had been transferred to SPO.

[21] The Prepayment Disclosure references a "prepayment premium" while the Loan Terms and Balances/Loan Activity document (Pl. Ex. 19) references an "unpaid penalty." Def. Ex. 18, Pl. Ex. 19. It appears both of these terms refer to the same thing.

[22] The principal loan amount was $224,000, which together with the prepayment premium of $96,346.68 equals $320,346.68. The total paid by APC and the Stanfords equals $319,111.92. The Court is not sure why the two totals are a bit off from each other, but it will become clear why the exact figure is irrelevant.

[23] Mr. Denaburg's insolvency analysis, introduced into evidence as Plaintiff's Exhibit 16, contained, in addition to his calculations of the Debtors' assets and liabilities, a list of the documents he consulted in making his analysis and a summary of his education, certifications, associations, work experience, and qualifications.

[24] For example, Mr. Denaburg increased the value of real property located on Industrial Lane upward from the scheduled value due to a higher credit bid. He decreased the value of real property located on Saddlecreek Trail from the scheduled amount due to foreclosure for less than the scheduled amount. Pl. Ex. 16 at 5; Tr. Vol. 2, 34:3-35:25.

A        Actually, if you just look at it like that, that on its face doesn't necessarily define insolvency. . . . It you got to look at the facts and circumstances.

. . . .

So in this case, there wasn't a lot of gray area. . . . [W]hen [Mr. Stanford's] assets are seven million, and his liabilities are seventeen million, and bills aren't getting paid, and you're in loan workout for at least two years prior to filing, you're insolvent.

So my understanding, it's a normal bankruptcy definition that liabilities [in] excess of assets make insolvent. To me, you got to drill down and look at more of the facts and circumstances of what the assets are, and what the liabilities are.

Tr. Vol. 2, 54:20-55:18. Mr. Denaburg opined that the Debtors would have been insolvent on February 25, 2019, the date of the loan, whether or not the loan had been made.[25]

Testimony at trial addressed insolvency of and value of APC as well. Mr. Denaburg testified that "[i]n January of '19, the company was worthless. The stock to me would have been worthless to any normal purchaser."[26] Tr. Vol. 2, 32:5-6. In addition, Mr. Denaburg explained it was not necessary to place a value on APC when determining the Stanfords' insolvency "because it was not relevant. It was just whether they were dead. And to me, they were dead . . . . Looking at the financial statements, the company should have died before they died."[27] Tr. Vol. 2, 75:19-21, 76:11-12.

Mr. Stanford also testified as to the financial state of APC from January and February 2019:

---

[25] On cross examination, counsel for Defendants questioned Mr. Denaburg about the amount of his fees versus the amount that has been recovered for the Stanfords' bankruptcy estate, whether Mr. Denaburg had worked with the Trustee on previous occasions, and the number of times Mr. Denaburg has worked with Plaintiff's counsel. In fact, counsel for the Defendants asked "[f]air to say [Plaintiff's counsel's firm] are sources or income for you at the firm?" Tr. Vol. 2, 53:5-6. Rephrasing the question, Defendants' counsel asked if Plaintiff's counsel's firm is "a referral source for your firm on some level." Tr. Vol. 2, 54:24-25. As Plaintiff's counsel pointed out, Mr. Denaburg "works for a lot of different law firms besides our firm." Tr. Vol. 2, 54:2-4. Suffice it to say that this Court is extremely familiar with Mr. Denaburg as he has worked with numerous counsel in cases before this Court for a number of years, and in fact, decades. To the extent counsel for Defendants was insinuating that Mr. Denaburg is biased in favor of Plaintiff's counsel, the implication was not well received by this Court. The Defendants could have brought their own expert to rebut Mr. Denaburg's testimony but for whatever reason declined to do so. The suggestion that Mr. Denaburg's testimony could be biased due to his having worked with Plaintiff's counsel before is insufficient without any valid basis to make this Court question Mr. Denaburg's credibility.
[26] The agreement providing that Mr. Wright would transfer his stock to Mr. Stanford was dated January 2, 2019. Tr. Vol. 2, 80:10-22; Def. Ex. 2.
[27] Mr. Denaburg was not asked to determine whether or not APC was solvent. See Tr. Vol. 2, 73-11-74:11

11

> Q      What was the state of American Printing Company's finances in January of 2019?
> A      We were insolvent at the time.
> Q      What do you mean by insolvent?
> A      Well, our assets, our liability was greater than our assets at the time --
> . . . .
> Q      What was American Printing Company's relationships with its suppliers in January 2019?
> A      We had to pay for, you know, paper and supplies up front. We were at that point awith our vendors.
> Q      When you say you were at that point with your vendors, why were you at that point with your vendors?
> A      We were underwater. We were insolvent. We owed -- owed the vendors money.
> Q      So that was in January of 2019. What about February of 2019? What was the state of American Printing Company's finances at that time?
> A      Still the same. Deal is we were underwater at the time. Insolvent.

Tr. Vol. 1, 9:20-9:25; 10:1-17. Mr. Stanford testified that APC's bankruptcy schedules reflecting assets of $5,334,980.27 and liabilities of $17,054,574.09 were accurate. APC. Tr. Vol. 1, 10:25-11:11. In addition, Mr. Stanford was questioned about the value of the APC stock that was acquired from Mr. Wright. According to his testimony, the stock was worthless because APC "was upside down." Tr. Vol. 1, 24:13-18. Mr. Wright also testified as to the value of the stock, stating that he believed the fair market value to be "zero" based on financial statements at the end of his employment showing liabilities and equity exceeding assets by millions of dollars.[28] Tr. Vol. 1, 144:15-145:9.

---

[28] Counsel for the Trustee questioned Mr. Wright about the transfer of his shares in APC. *See* Tr. Vol. 1, 146-49. In particular, counsel for the Trustee asked about Mr. Wright's trial testimony wherein he stated that he sold his shares then stated that he gave the shares to Mr. Stanford. Tr. Vol. 1, 147:20-25. Mr. Wright explained:

> A      That was semantical. Obviously, you know, the price of a -- of a share is -- is based off of the financial statements. I wasn't giving the shares back until I got reimbursed my money.
> Q      Okay.
> A      So however you want to call that transfer, or selling, or giving them back, he wasn't going to get them back until I got my money.
> Q      Regardless of what you thought about the value of the shares?
> A      Correct.
> Q      Because in your mind, and having had looked at the financial statements of APC just a little bit before February 2nd -- excuse me, January 2nd, 2019, you were aware of what those financial statements showed?

The testimony of Mr. Stanford, Mr. Wright, and Mr. Denaburg indicated that Mr. Wright's shares had no value. Despite the lack of value, Mr. Stanford nonetheless wanted to obtain Mr. Wright's shares. Mr. Stanford testified on direct examination that he regardless wanted the stock back because "it's sentimental to me. You know, I built the company up twenty-something years, and I'd like to have it back." Tr. Vol. 1, 24:19-24. During cross-examination counsel for Axos further questioned Mr. Stanford about the purchase of Mr. Wright's shares given APC's financial state:

> Q        And Mr. Wright was paid from the APC loan proceeds, correct, for the 40,000?
> A        Correct.
> Q        So APC pays Don Wright 40k, that's right? And in exchange, you receive the stock back which vested you [sic] and your wife, correct?
> A        Yes.
> . . . .
> Q        So APC spends the 40k. And you're saying -- I believe you testified they didn't have any dollars to spare at that time, but you're directing them to spend 40,000, correct?
> A        Yes.
> Q        Because you want these shares back, correct?
> A        Yes.
> Q        And the reason you said is because they serve sentimental value?
> A        That's correct.
> Q        So that sentimental value is trumping all this money that the company needs at the time?
> A        Yes.

Tr. Vol. 1, 82:20-83:1; 84:8-19. Mr. Stanford's sentimentality regarding APC despite its poor financial state was further reflected in Mr. Denaburg's testimony that "Mr. Stanford's one of the most optimistic people I've met. . . . And he was trying to save his child, but his child was dead.

---

> A        That's correct.
> Q        And what did they show?
> A        They showed, again, assets -- I mean liabilities and equity greater than the assets. So the company was worth nothing.

Tr. Vol. 1, 148:6-25.

13

Case 21-00031-TOM   Doc 155   Filed 08/04/26   Entered 08/04/26 15:39:35   Desc Main
Document      Page 13 of 39

His child had been dead. But Mr. Stanford's the personality that would keep going. They just wouldn't make any of the changes necessary. And it had gotten so far down, the changes wouldn't have mattered." Tr. Vol. 2, 76:13-14, 17-22.

The reference to APC as Mr. Stanford's "child" and that his sentimental attachment to the stock he wanted back from Mr. Wright, may explain to some degree the interaction and financial intermingling by and between the Stanfords and APC. This court is familiar with small businesses, sometimes referred to as a "Mom and Pop" businesses, that are owned and operated by a couple. This was the situation with APC. Based on this Court's experience, it is not unusual to see that some personal bills, a utility bill or a credit card are paid by the business even though the bill and the charges are the individuals' liability. This intermingling, or as usually referenced in the cases and here by the parties as commingling, did occur between the Stanfords and APC. Some nonpayroll checks were written and negotiated from APC accounts for the benefit of the Stanfords. Some checks were payable to them, some to a credit card or other similar expense, and some of these expenditures were for very large amounts. This activity was on a fairly regular and consistent basis, but on close analysis of a few months of Southpoint Bank statements offered as exhibits for the trial, the number of checks written and the total amounts paid were not that prevalent and certainly not overwhelming when compared to the total number of checks written on APC accounts. *See generally* Def. Exs. 30-34. The Court finds that although there was commingling by and between the Stanfords and APC, it was occasional yet consistent, but a small percentage of the total number of checks written on APC and a small percentage of the total dollar amounts written on the APC accounts.

At the hearings after remand,[29] the focus was primarily on identify of interests between the Stanfords and APC, and the importance of whether APC had been insolvent. Counsel for the Trustee and counsel for Axos identified factors that each considered relevant to the Court's determination of whether an identity of interests existed[30]. While each party was, in large part, in agreement on what the factors are, they differed significantly about how each should be applied. The parties disagreed as well as to whether the insolvency of APC, if present, would impact the identity of interests issue and thus affect the ultimate outcome of this adversary proceeding.

**CONCLUSIONS OF LAW**

The Trustee seeks to avoid the Stanfords' obligations under the Guaranty, avoid the Mortgage, and avoid the transfer of the loan payoff. Further, the Trustee seeks to recover from Axos, WBL, and SPO the value of the interest conveyed by the Mortgage and to recover the loan payoff from SPO.

Bankruptcy Code § 548 governs a trustee's ability to avoid fraudulent transfers and obligations,[31] whether they were made with actual intent to defraud or made under such circumstances that the transfers are constructively fraudulent. In this adversary proceeding the Trustee seeks avoidance only under the Bankruptcy Code provision dealing with constructive fraudulent transfers, § 548(a)(1)(B), the relevant portion of which provides as follows:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--

---

[29] The Court heard arguments on two separate dates after remand, with the latter date particularly focused on the issues to be resolved on remand.

[30] The day before the June 10, 2026 hearing, at the Court's request, Counsel for the Trustee and Counsel for the Defendants graciously agreed to participate in a telephonic status conference to outline the issues to be argued.

[31] The Bankruptcy Code also provides that fraudulent transfers may be avoided under state law but the Trustee did not plead any state law counts in this adversary proceeding.

. . . .
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation[.]

11 U.S.C. § 548(a)(1)(B)(i) – (ii)(I).

According to the United States Supreme Court in *BFP v. Resolution Trust Corporation.*:

> [Bankruptcy Code § 548] permits to be set aside not only transfers infected by actual fraud but certain other transfers as well—so-called constructively fraudulent transfers. The constructive fraud provision . . . permits avoidance if the trustee can establish (1) that the debtor had an interest in property; (2) that a transfer of that interest occurred within one year of the filing of the bankruptcy petition; (3) that the debtor was insolvent at the time of the transfer or became insolvent as a result thereof; and (4) that the debtor received "less than a reasonably equivalent value in exchange for such transfer."

*BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535, 114 S. Ct. 1757, 1760, 128 L. Ed. 2d 556 (1994).[32] "Fraudulent transfer issues are heavily fact dependent and generally come down to the credibility of witnesses. . . . [T]he party alleging a fraudulent conveyance bears the burden of proof by a preponderance of the evidence." *Andrews v. RBL, L.L.C. (In re Vista Bella, Inc.)*, BK No. 11-00149-MAM-7, AP No. 12-00060-MAM, 2013 WL 2422703, at \*10 (Bankr. S.D. Ala. June 4, 2013) (citations omitted). However, "[o]nce the Trustee has made his prima facia case that a transfer constitutes a fraudulent transfer . . . the burden of producing evidence shifts to the transferee to demonstrate that the Debtor received a benefit or that there was some legitimate purpose for the transfer." *Welt v. Jacobson (In re Aqua Clear Techs., Inc.)*, 361 B.R. 567, 582 (Bankr. S.D. Fla. 2007).

---

[32] At the time the *Resolution Trust Corporation* case was handed down, § 548 allowed trustees to reach back for a period of one year. In an April 2005 amendment Congress expanded the reach-back period to two years. 5 *Collier on Bankruptcy* ¶ 548.12 (16th ed. 2024).

Here, certain elements of the fraudulent transfer claims need little discussion. The Stanfords owned the Florida Condo. They transferred an interest in the Florida Condo by way of the Mortgage to Axos, and incurred an obligation by executing the Guaranty. These events took place only months before the Stanfords filed their bankruptcy petition. This leaves the Trustee with the burden of proving that, at the time of the transfer and obligation, the Stanfords were insolvent or became insolvent as a result, and that the Stanfords did not receive reasonably equivalent value in exchange.

## I. THE STANFORDS' INSOLVENCY

According to the Bankruptcy Code:

> (32) The term "insolvent" means –
> (A) with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of –
> (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and
> (ii) property that may be exempted from property of the estate under section 522 of this title[.]

11 U.S.C. § 101(32). *See also Roach v. Skidmore Coll. (In re Dunston)*, 566 B.R. 624, 638 (Bankr. S.D. Ga. 2017) ("[T]he analysis of a debtor's solvency is a "balance sheet test," examining whether the debtor's assets exceed her liabilities."); *Schwartz v. Halwani (In re 274 Atl. Isles, LLC)*, 651 B.R. 319, 331 (Bankr. S.D. Fla. 2023) ("To determine whether a debtor is insolvent, the Court must compare the debtor's debt obligations with the debtor's assets, at fair value, as of the relevant date. This is often described as the balance sheet test.") (quoting *Mukamal v. Nat'l Christian Charitable Found., Inc. (In re Palm Beach Fin. Partners, L.P.)*, 598 B.R. 885, 889-90 (Bankr. S.D. Fla. 2019)).

Edward Denaburg, an expert witness for the Trustee, provided credible testimony that his analysis showed that as of the date of bankruptcy the Stanfords had liabilities in excess of their

assets by $9,000,000 to $10,500,000. Thus, according to both the "balance sheet" test, and to the Bankruptcy Code's own definition of insolvency, the Stanfords were insolvent at the time of their bankruptcy filing. As Mr. Denaburg noted, there was not "a lot of gray area" in the gap between the Stanfords' assets and liabilities. The Defendants did not present sufficient, if any, evidence to counter Mr. Denaburg's assessment. The Court concludes that the Trustee has met his burden of proving the Stanfords were insolvent at the time of the loan transaction.

## II.    REASONABLY EQUIVALENT VALUE

As one court has explained:

> Reasonably equivalent value ("REV") is not specifically defined in the Bankruptcy Code. However, the purpose of the requirement is well known: "to protect creditors against the depletion of a bankrupt's estate." *In re TOUSA, Inc.*, 680 F.3d 1298, 1311 (11th Cir.2012); *In re Rodriguez*, 895 F.2d 725, 727 (11th Cir.1990). Therefore, § 548(a)(1)(B) "does not authorize voiding a transfer which confers an economic benefit upon the debtor" because "the debtor's net worth will have been preserved, and the interests of the creditors will not have been injured by the transfer." *Rodriguez*, 895 F.2d at 727.

*Vista Bella*, 2013 WL 2422703, at \*16. Significantly, the court makes clear that there is a difference between "value" and "reasonably equivalent value":

> The pivotal question asks what value a debtor received from a transfer. The Bankruptcy Code defines "value" for § 548 purposes in § 548(d)(2)(A), to include "property, or satisfaction or securing of a present or antecedent debt of the debtor." The Bankruptcy Court for the Northern District of Georgia recently utilized the following three-part test for whether a debtor received [reasonably equivalent value]: "(1) whether the debtor received value; (2) whether the value received was in exchange for the property transferred; and (3) whether the value was reasonably equivalent to the value of the property transferred." *In re Knight*, 473 B.R. 847, 850 (Bankr. N.D. Ga. 2012).

*Vista Bella*, 2013 WL 2422703, at \*16. Further, the court recognized that the analysis of reasonably equivalent value will not always be the same, noting "it is clear that the court's inquiry into whether [reasonably equivalent value] was received is largely factual and depends on the circumstances of the case." *Id.* (citing *Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.)*, 904 F.2d

18

588, 593 (11th Cir.1990); *Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298, 1311 (11th Cir. 2012).

While "the concept of 'reasonably equivalent value' does not demand a precise dollar-for-dollar exchange," *Advanced Telecomm. Network, Inc. v. Allen (In re Advanced Telecomm. Network, Inc.)*, 490 F.3d 1325, 1336 (11th Cir. 2007) (citing *Henderson v. Andrews (In re Perry Cnty. Foods, Inc.)*, 313 B.R. 875, 895 (Bankr. N.D. Ala. 2004)), the "value received needs only be 'reasonably equivalent' in value to what was transferred. *PSN Liquidating Trust v. Intelsat Corp. (In re PSN USA, Inc.)*, 615 Fed. App'x 925, 932 (11th Cir. 2015). The value received cannot be "disproportionally small" to the value given. *Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 933 (2nd Cir. 1981).

In *Wessinger v. Spivey (In re Galbreath)*, the bankruptcy court addressed a situation wherein the debtor became obligated for a debt his company already owed and the Chapter 7 trustee sought avoidance as a fraudulent transfer. *Wessinger v. Spivey (In re Galbreath)*, 286 B.R. 185 (Bankr. S.D. Ga. 2002). The creditor hired the debtor's company for subcontracting work for road construction. *Id.* at 190. The creditor, obligated by contract, advanced funds to and made payments on behalf of the debtor's company so that it could continue to operate. *Id.* at 190-91. After the company's debt to the creditor exceeded $1,000,000, the debtor, his company, and others agreed to execute a promissory note in favor of the creditor, secured by security deeds on the debtor's real property. *Id.* at 192. Importantly, the debtor was not personally obligated to the creditor at this time. *Id.* at 207. The debtor received no new consideration for the note or the security interests securing the debt. *Id.* at 193. The next year the debtor and his company were put into involuntary Chapter 7 bankruptcy cases; in the individual debtor's case, the Chapter 7 trustee brought an adversary proceeding to set aside the note and security deeds executed by the debtor as

19

fraudulent transfers. *Id.* at 189-90. Ultimately, the court determined that the debtor had not received reasonably equivalent value for the transfers, and that the note and security deeds were constructively fraudulent transfers that were due to be avoided. *Id.* at 215.

The fact that the debtor incurred the debt for the benefit of his business was central to the court's determination. The court recognized:

> Obligations incurred solely for the benefit of third parties are generally not supported by reasonably equivalent value. *See, e.g., Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir.1981) ("If the debt secured by the transaction is not the debtor's own, then his giving of security will deplete his estate without bringing in a corresponding value from which his creditors can benefit, and his creditors will suffer just as they would if the debtor had simply made a gift of his property or obligation.") (discussing "fair consideration" requirement under former Bankruptcy Act); *Coan v. Fleet Credit Card Servs. (In re Guerrera)*, 225 B.R. 32, 36 (Bankr.D.Conn.1998) ("Transfers made or obligations incurred solely for the benefit of third parties do not furnish reasonably equivalent value, unless the debtor's net worth is unaffected because [he] received a direct or indirect economic benefit from the transfer." (emphasis in original))[.]

*Galbreath*, 286 B.R. at 207-08. The Court noted that "where a 'debtor's net worth has been preserved' [then] the 'reasonably equivalent value' requirement is met. A debtor's net worth is preserved where he incurs an obligation . . . to satisfy or secure a then-existing debt . . . or . . . incurs the obligation in exchange for a direct or indirect benefit sufficient to preserve the debtor's net worth." *Id.* at 208 (citing *General Electr. Credit Corp. v. Murphy (In re Rodriguez)*, 895 F.2d 725, 727-28 (11th Cir. 1990); *Rubin*, 661 F.2d at 991-92).

Here, the Mortgage and Guaranty were executed by the Stanfords for the sole purpose of enabling APC to obtain the loan from Axos; thus, according to the general rule set forth in *Rubin* and recognized in *Galbreath*, the Stanfords did not receive reasonably equivalent value for the transfer made by executing the Mortgage and the obligation incurred to Axos for the benefit of APC. The Stanfords paid the APC debt with the sales proceeds from their personally owned, and previously unencumbered, Florida Condo. But for the Guaranty and Mortgage, the Florida Condo

would have been an unencumbered asset that could be liquidated for the benefit of the Stanfords' creditors; therefore, the Stanfords' estate was diminished by the transfers. However, as noted in *Galbreath*, the transfers might still constitute reasonably equivalent value if the Stanfords received "a direct or indirect benefit sufficient to preserve [their] net worth." *Galbreath*, 286 B.R. at 208.

It was established at trial that the entirety of the APC loan proceeds, except those used for payment to Mr. Wright and for property taxes on the Florida Condo, was deposited into the APC Southpoint Account. No loan proceeds went directly to the Stanfords, and they did not receive a direct benefit from the loan – with one exception. Loan proceeds of $1,605.63 were paid at closing directly to a creditor for a debt owed by the Stanfords individually; namely, the property taxes on the Florida Condo. As a result, the Stanfords received direct value of $1,605.63. The direct value does not remotely preserve the Stanfords' estate in comparison to the value that the Stanfords transferred by executing the Mortgage and Guaranty. The Trustee has met his initial burden of proving lack of reasonably equivalent value.

The question becomes whether the Stanfords received indirect value that would suffice as reasonably equivalent value. According to *Collier on Bankruptcy*, "if the transfer does not negatively affect the debtor's net worth because the transfer caused the debtor to receive an indirect benefit, then there may have been reasonably equivalent value." 5 *Collier on Bankruptcy* ¶ 548.05 (16th ed. 2024). The often-cited case of *Rubin v. Manufacturers Hanover Trust Company*[33] provides guidance in this respect:

> If the consideration given to the third person has ultimately landed in the debtor's hands, or if the giving of the consideration to the third person otherwise confers an economic benefit upon the debtor, then the debtor's net worth has been preserved, and § 67(d) has been satisfied-provided, of course, that the value of the benefit received by the debtor approximates the value of the property or obligation he has given up.

---

[33] Although *Rubin* was decided under the Bankruptcy Act of 1898, courts have considered it still relevant under the Bankruptcy Code. *Rodriguez*, 895 F.2d at 727.

*Rubin*, 661 F.2d at 991-92. While a trustee does not lose the burden of proof for the elements of a fraudulent transfer, once the trustee establishes there was no direct benefit to the debtor then the defendant has the burden of producing evidence of indirect benefit. *First Nat'l Bank v. Minnesota Utility Contracting, Inc. (In re Minnesota Utility Contracting, Inc.)*, 110 B.R. 414, 419 (D. Minn. 1990). *See also Aqua Clear*, 361 B.R. at 582 ("Once the Trustee has made his prima facia case that a transfer constitutes a fraudulent transfer . . . the burden of producing evidence shifts to the transferee to demonstrate that the Debtor received a benefit . . . ."); *Unencumbered Assets Trust v. Biomar Techs., Inc. (In re Nat'l Century Fin. Enters.)*, 341 B.R. 198, 218 (Bankr. S.D. Ohio 2006) (determining that once the trustee's initial burden of proof was satisfied by "showing that the consideration for the Transfers went directly to third-parties" then the defendant "bears the burden of production to show that [the debtor] received a concrete, quantifiable, and tangible indirect benefit that was reasonabl[y] equivalent to the . . . cash value of the transfers."). *See also* 5 *Collier on Bankruptcy* ¶ 548.05 (16th ed. 2024).

At trial Defendants' counsel and Mr. Stanford reviewed checks and transfers from the APC Southpoint Account that were paid to Mr. Stanford, Mrs. Stanford, or were used to pay a Chase credit card in Mr. Stanford's name. Although Defendants' counsel asked about payments through May 2019, the Court finds that transactions past March 13, 2019 should not be considered since the account had a negative balance on that day. It cannot be said whether payments that went to the Stanfords or the Chase card came from the loan proceeds or from other deposits to the account made before or after the loan proceeds were deposited. However, all money in the account, no matter what the source, was gone as of March 13, 2019; thus, the loan proceeds could not have

been the source for any payments to the Stanfords or Chase after that date.[34] A total of $40,000 was paid either to the Stanfords or to the Chase card from February 27, 2019 to March 13, 2019 from the APC Southpoint Account; thus, loan proceeds indirectly provided value to the Stanfords in the amount of $40,000.

The Defendants have argued that the Stanfords benefitted by the loan because the proceeds allowed APC to continue operating. "'A corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial to it.'" *TOUSA*, 680 F.3d at 1312 (quoting *Bloor v. Dansker (In re Invs. Funding Corp. of New York Sec. Litig.)*, 523 F. Supp. 533, 541 (S.D.N.Y. 1980)). Here, Mr. Stanford testified that the loan did not improve APC's finances, and only kept the business going for an additional three to four days. APC did continue to operate for a short time prior to filing bankruptcy, but as already explained, the loan proceeds did not contribute to operations past March 13, 2019. However, the continued operations of APC are discussed, infra, in relation to the issues on remand.

The Defendants also argue that the Stanfords received value from the money paid to Mr. Wright to buy his shares. Reacquisition of the shares merely provided the Stanfords with additional shares in a severely troubled company. This Court presided over APC's bankruptcy and is aware of APC's precarious financial position at the time the case was filed, barely over two months from the loan transaction date. Testimony presented in this adversary proceeding further evidences that APC's financial difficulties extended back to at least the time the loan was made, such as Mr. Stanford's statement that he knew APC could not make the payments when the loan was obtained,

---

[34] It was brought up during the trial that money from the APC Southpoint Account was moved to the APC Servis1st Account, and that payments in the total amount of $15,000 were made to the Chase card from the APC Servis1st Account. There is no evidence that the money deposited into the APC Servis1st Account came from the loan proceeds and the Court cannot consider those payments to be an indirect benefit to the Stanfords. Ultimately, it makes no difference since adding $15,000 to the indirect benefit that the Stanfords received would not bring the total of indirect benefit up to reasonably equivalent value. *See* Part III, *infra*.

Mr. Denaburg's opinion that APC was insolvent at the time of the loan, and Mr. Wright's testimony that he paid for APC's supplies from his own pocket since APC did not have the money. Although Mr. Stanford explained he wanted the shares for "sentimental" reasons, it appears to this Court that the primary reason the Stanfords reacquired the stock was out of necessity: Axos required a guaranty from each owner of APC shares; Mr. Wright would not sign a guaranty, and thus, the Stanfords had to obtain Mr. Wright's shares for APC to obtain the loan.[35] In that respect, the real benefit went to APC, not the Stanfords. According to the testimony of Mr. Stanford, Mr. Denaburg, and Mr. Wright, the APC shares that Mr. Wright transferred to Mr. Stanford had no value; therefore the Stanfords did not obtain any value from acquiring them.

The Defendants also contend that the Stanfords received value since the loan proceeds allowed APC to pay its employees, thereby protecting the Stanfords from personal liability for employee claims for non-payment. At trial, while addressing an objection by the Trustee's counsel to a particular line of questioning, Defendant's counsel argued that if APC employees had not been paid then the employees would have had claims against the Stanfords. The Defendants' counsel is referring to potential liability under the Fair Labor Standards Act ("FLSA"). Any connection between the loan proceeds and the Stanfords escaping personal liability to APC's employees is tenuous at best. It is not clear that payments to employees were made from the loan proceeds; the source could have been money already in the APC Southpoint Account or money deposited into the account after the loan proceeds were deposited. Regardless, it has not been established that the Stanfords had personal liability for payroll in the first place. It has been said that indirect benefits must be concrete, quantifiable, and tangible. *Nat'l Century Fin. Enters*, 341 B.R. at 217-19. There

---

[35] It was evident from the testimony at trial that the price the Stanfords paid for Mr. Wright's shares was determined by the amount APC still owed Mr. Wright, and not by any other measure of value.

24

is no concrete, quantifiable, or tangible benefit to the Stanfords with regards to escaping liability under the FLSA.

## III.    AVOIDANCE

Turning back to the three-part test set out in *Vista Bella*, the answer to the first question, whether the debtor received value, is yes. The Stanfords received a direct benefit of $1,605.63 from the Florida Condo tax payment, and possibly an indirect benefit of $40,000 from money in the APC account that went to the Stanfords or was used to pay their bills on or before March 13, 2019. The Stanfords received no other value from the loan. The answer to the second question, whether the value was in exchange for the property transferred, is also yes. The Stanfords received a total benefit of $41,605.63 from the Axos loan to APC, a loan that was made as a result of the Stanfords' execution of the Guaranty and Mortgage. The third question, whether the value was reasonably equivalent to the value of the property transferred, is no. The Stanfords received $41,605.63 in exchange for their Guaranty and Mortgage initially securing a $320,000 debt, which ultimately resulted in a loan payoff by the Stanfords of $275,988.28 from the sale of their Florida Condo. The $41,605.63 value received by the Stanfords compared to the $275,988.28 paid by the Stanfords is, needless to say, a substantial difference. Reasonably equivalent value does not require a dollar-for-dollar exchange but, in the words of the Eleventh Circuit Court of Appeals, the "value received needs only be 'reasonably equivalent' in value to what was transferred." *PSN USA*, 615 Fed. App'x at 932. Looking at the dollar amounts paid to or for the benefit of the Stanfords in comparison to the total loan proceeds paid in to APC's Southpoint account, the Court must find the Stanfords did not receive reasonably equivalent value for the transfers and obligation the Trustee seeks to avoid.[36] Considering the facts and circumstances of this adversary proceeding,

---

[36] The value received by the Stanfords will be discussed again later in this opinion.

25

the Court concludes that the Florida Condo Mortgage, the loan payoff, and the obligation imposed by the Guaranty are due to be avoided under Bankruptcy Code § 548(a)(1)(B).

## IV.    RECOVERY OF THE AVOIDED TRANSFERS

Recovery of avoided transfers is governed by Bankruptcy Code § 550, which provides in relevant part:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a). Bankruptcy Code § 550(a) therefore gives a trustee the option to recover from one or more transferees down the chain, unless a defense is available to the transferee under § 548(c) or § 550(b).[37] The distinction between whether a transferee is an "initial transferee" that takes the original transfer from the debtor, or is a subsequent transferee down the line, is important since § 550(b) does not apply to initial transferees. *Kapila v. SunTrust Mortg., Inc. (In re Pearlman)*, 515 B.R. 887, 899 (Bankr. M.D. Fla. 2014); *In re ATM Fin. Servs., LLC*, 446 B.R. 564, 568 (Bankr. M.D. Fla. 2011) ("[I]f a transfer is avoidable under § 548, the trustee can always recover from initial transferees under § 550."). Under either § 548(c) or § 550(b), courts generally hold that the transferee has the burden of proof. *Bakst v. United States (In re Kane & Kane)*, 479 B.R. 617, 631 (Bankr. S.D. Fla. 2012); *see also* 5 *Collier on Bankruptcy* ¶¶ 550.03, 548.09 (16th ed. 2024).

### Bankruptcy Code § 548(c) defense

According to § 548(c):

---

[37] Axos contends there is an additional defense available to it which will be discussed *infra*.

(c) Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c). Under this subsection, a transferee that takes for value and in good faith will have a lien, but only to the extent that value was given to the debtor in exchange for the transfer. Unlike § 550(b)(1), which only requires that a transferee "takes for value," § 548(c) specifies that value must have been given to the debtor.

According to the Eleventh Circuit Court of Appeals:

However, § 548(c) provides a transferee with an affirmative defense where the transferee acts in good faith and "[gives] value to the debtor in exchange for such transfer...." The term "value" is defined to include "satisfaction or securing of a present or antecedent debt of the debtor." 11 U.S.C. § 548(d)(2)(A). Although antecedent debt is not defined, the term "debt" is stated to include "liability on a claim," 11 U.S.C. § 101(12), and "claim" is broadly defined as the "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5).

*Perkins v. Haines*, 661 F.3d 623, 626–27 (11th Cir. 2011). This Court has discussed at length the direct and indirect value the Stanfords received[38] for the Florida Condo Mortgage and the Guaranty, but this value came only from Axos, who made the loan to APC. The Defendants have not provided the Court with any evidence that either WBL or SPO gave any value at all to the Stanfords; therefore, neither WBL nor SPO can benefit from § 548(c).

The question now is whether Axos took the transfer in good faith. It is often noted that "good faith" is not defined in the Bankruptcy Code and there is no real consensus as to what good faith entails. Harris Winsberg & Karen Visser, *Good Faith for Value Defenses: Understanding the*

---

[38] Again, the Court is not certain that the funds from the APC Southpoint Account that went to the Stanfords or Chase actually came from the loan proceeds.

*Use of Good Faith and Value Concepts in Fraudulent Transfer Cases*, 26 Norton J. Bankr. L & Prac., Art. 1 (2017). One bankruptcy court at least has managed to succinctly describe it: "[good faith] arises in various contexts, but always means about the same thing: fair dealing without evil intent." *Drake v. Peeples (In re Topgallant Group, Inc.)*, Bankruptcy No. 89-41997, Adversary Proceeding No. 91-4142, 1996 WL 33366594, at *20 (Bankr. S.D. Ga. Aug. 18, 1996). Determining whether the transferee has acted in good faith "will be highly factual, and the outcome will depend heavily upon the circumstances of each particular case." Winsberg & Visser, *Good Faith for Value Defenses*.

A helpful summary of several factors to consider when analyzing good faith in a fraudulent transfer context were laid out by the bankruptcy court in *Cuthill v. Kime (In re Evergreen Security)*, *Ltd.*:

> To determine whether a transferee acted in good faith for purposes of section 548(c), the court must look at what the transferee objectively "knew or should have known," and conclude that the transferee did not act in good faith because it had sufficient knowledge to place it on inquiry notice of the voidability of the transfer or the debtor's insolvency. A transferee may not remain willfully ignorant of facts which would cause notice of a debtor's fraudulent purpose. Good faith is to be measured objectively, rather than subjectively. Consequently, a transferee may not put on "blinders" prior to entering into transactions with the debtor and claim the benefit of section 548(c), where circumstances would place the transferee on inquiry notice of the debtor's fraudulent purpose or insolvency. Circumstances putting the transferee on inquiry notice as to a debtor's insolvency, an underlying fraud, or the improper nature of a transaction, will preclude a transferee from asserting a good faith defense.

*Cuthill v. Kime (In re Evergreen Security, Ltd.)* 319 B.R. 245, 254-55 (Bankr. M.D. Fla. 2003) (Briskman, J.) (internal citations and paragraph numbers omitted). Inquiry notice that would preclude a transferee's good faith defense has been described as "knowledge of suspicious facts that need not suggest a 'high probability' of wrongdoing but are nonetheless sufficient to induce a

Case 21-00031-TOM    Doc 155    Filed 08/04/26    Entered 08/04/26 15:39:35    Desc Main
Document      Page 28 of 39

reasonable person to investigate." *Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*, 12 F.4th 171, 185 (2d Cir. 2021).

Axos is the only party able to assert the § 548(c) defense. Mr. Pardes testified, however, that WBL handled the intake process including collecting and processing information, underwriting loans according to Axos's guidelines, and submitting the application to its own internal credit committee before sending it to Axos for credit approval so it is necessary to address WBL's role in processing the Loan Application. According to Mr. Pardes, WBL, acting as a "service provider" for Axos, examined the Stanfords' bank statements, credit reports, and collateral values, conducted a social media search, and obtained an attorney opinion letter regarding the Stanfords. Although Mr. Pardes's testimony was not very clear, it appears that WBL did not consider it relevant that the Stanfords had substantial debt, had serious delinquencies, and did not pay accounts as agreed, as reflected on the CoreLogic credit report. Instead, it apparently considered only "trade line delinquencies" and perhaps other criteria that has not been adequately explained to this Court. Further, Mr. Pardes admitted that the Stanfords were subprime guarantors.[39] It does not matter, however, what internal criteria WBL, and by extension Axos, used to evaluate the Stanfords' financial condition. The question is an objective one: whether WBL, and therefore Axos, knew or should have known of the Stanfords' insolvency. Based on the evidence, the Court concludes that the answer is "yes." WBL and Axos knew or should have known that the Stanfords were insolvent when the loan was made, and as a result, Axos did not meet its burden of proving that it was a transferee that took in good faith as contemplated under § 548(c).

---

[39] According to Black's Law Dictionary, the adjective "subprime," in the context of a loan, "involve[es] an amount of money that a borrower may not be able to pay back, usu[ally] at a high rate of interest." *Subprime, Black's Law Dictionary* (12th ed. 2024). That WBL considered the Stanfords to be subprime guarantors is itself indicative that WBL, and Axos, realized that the Stanfords were in a poor financial condition.

**Bankruptcy Code § 550(b) defense**

While § 548(c) does not prevent a transfer from being avoided, instead allowing the transferee a lien, the § 550(b) good faith defense completely prevents recovery from a subsequent transferee. According to § 550(b):

> (b) The trustee may not recover under section (a)(2) of this section from--
> (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
> (2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550(b) (footnote omitted). Axos, as initial transferee of the mortgage interest, and SPO, as initial transferee of the loan payoff, are not transferees for the purposes of § 550(b). S*ee Pearlman*, 515 B.R. at 899. However, since WBL and SPO are subsequent transferees of the Mortgage, they may assert the § 550(b) good faith defense as to the Trustee's recovery of the value of the mortgage interest. The order in which WBL and SPO obtained the Mortgage determines what each must prove under § 550(b), as explained in *Collier on Bankruptcy*:

> The difference in language between subsections (b)(1) and (b)(2) suggests that once a transferee of the debtor's initial transferee meets the requirements of (b)(1) (value, good faith and no knowledge of the transfer's voidability), then any subsequent transferee need only show good faith.

5 *Collier on Bankruptcy* ¶ 550.03 (16th ed. 2024). *See also In re Nat'l Audit Def. Network*, 332 B.R. 896, 915 (Bankr. D. Nev. 2005) ("[I]f a mediate transferee takes in good faith from another . . . who had the protection of Section 550(b)(1), then each subsequent transferee who takes in good faith is sheltered by its transferor's status, even if the transferee did not take for value or took with knowledge that the initial transfer was voidable."). Since WBL acquired the Mortgage from Axos, the initial transferee, WBL must prove all three prongs of § 550(b)(1) while SPO must only establish good faith under § 550(b)(2). The Court has already examined WBL's good faith, or lack thereof, at length in its discussion of § 548(c). WBL knew, or should have known, that the

Stanfords were insolvent. WBL did not take in good faith and is not entitled to protection under § 550(b)(1).

*Collier on Bankruptcy* suggests that a subsequent transferee cannot be a good faith transferee under § 550(b)(2) if its predecessor did not take for value, in good faith, and without knowledge of the voidability of the transfer under § 550(b)(1):

> On the other hand, the good faith of a subsequent transferee will not suffice to protect that transferee under section 550(b)(2) unless a predecessor (other than the initial transferee) transferee has met the requirements of section 550(b)(1).

5 *Collier on Bankruptcy* ¶ 550.03 (16th ed. 2024). This Court's research has not turned up cases definitively supporting or opposing this proposition, but it need not decide the issue. SPO has the burden to prove that it took the transfer of the mortgage interest in good faith, and there are no facts in evidence to support this. Neither WBL nor SPO is protected under § 550(b) from the Trustee recovering the value of the mortgage interest originally given by the Stanfords to Axos and subsequently transferred to WBL then SPO.

## V.      <u>IDENTITY OF INTERESTS</u>

The Court has determined that the Stanfords, while insolvent, made transfers to the Defendants. Further, this Court has determined that the Stanford's use of the resulting proceeds did not create or result in reasonably equivalent value to the Stanfords and thus the transfers could be avoided by the Trustee. The Defendants have argued, and the District Court has directed, that the Court should consider whether an identity of interests existed between the Stanfords and APC such that the Stanfords did in fact receive reasonably equivalent value for the transfers. Thus, this Court must consider whether an identity of interests existed between the Stanfords and APC and, if the Court finds that an identity of interests exists, it must then determine whether that identity

31

of interests equates to or results in the Stanfords having received reasonably equivalent value for their guaranty, mortgage, and the loan payoff transferred to the Defendants.

Both the Trustee and the Defendants agreed at the hearings on remand that the Court must consider the particular facts of the case and consider the totality of the circumstances to determine whether an identity of interests exists between the Stanfords and APC. The standard for determining if an identity of interests exists, which is typically between two entities, but here is between two shareholders and their wholly-owned corporation, has been stated in multiple cases including one from Judge Watson of the Bankruptcy Court for the Northern District of Alabama in 1982:

> [A]s a general rule, an insolvent debtor receives "less than a reasonably equivalent value" where it transfers its property in exchange for a consideration which passes to a third party. In such case, it ordinarily receives little or no value.
> A clear distinction from this rule exists, however, if the debtor and the third party are so related or situated that they share an "identity of interests," because what benefits one will, in such case, benefit the other to some degree.

*Garrett v. Falkner (In re Royal Crown Bottlers of North Alabama, Inc.)*, 23 B.R. 28, 30 (Bankr. N.D. Ala. 1982) (Watson, J.) (footnote omitted).[40] *See also Pembroke Dev. Corp. v. Commonwealth Sav. & Loan Assoc. (In re Pembroke Dev. Corp.)*, 124 B.R. 398, 400 (Bankr. S.D. Fla. 1991) ("This Court recognizes that an indirect benefit to the transferor may be sufficient to establish reasonably equivalent value where the debtor and third party 'are so related or situated that they share an identity of interests because what benefits one will, in such case benefit the other to some degree.'"); *In re BBL Group, Inc.*, 205 B.R. 625, 636 (Bankr. N.D. Ala. 1996).

While both sides agree on how courts have characterized the concept of identity of interests, they disagree as to how it should be applied. According to the Trustee's counsel, identity

---

[40] Most of the cases cited by the parties addressing identity of interests involve two entities, such as a parent and subsidiary, instead of the shareholder and wholly-owned corporation relationship as in this case. However, the Court finds that the reasoning in these cases is analogous to the case before this Court.

of interests is a subset of indirect value that requires the Defendants to first establish that an identity of interests was shared between the Stanfords and APC, and second, that some value accrued to the Stanfords on account of the identity of interests. In contrast, counsel for the Defendants argues that identity of interests is a separate, additional defense. Under either approach, the Court must determine whether an identity of interests exists.

At the hearings on remand the parties argued factors that each believe support a finding of identity of interests based on case law previously cited by the parties. One factor on which the parties agree is whether the Stanfords and APC commingled assets. Certainly, courts in multiple cases have considered commingling assets to be at least one factor indicating an identity of interests. *See, e.g., Welch v. Regions Bank (In re Mongelluzzi)*, 587 B.R. 392, 405-06 (Bankr. M.D. Fla. 2018) (Delano, J.) ("intermingled finances," among other facts, precluded the court from finding on summary judgment that an identity of interests did not exist). In addition, the parties agreed that the existence of shared liabilities is a factor indicating identity of interests. *See Pembroke Dev. Corp.*, 124 B.R. at 399-401 (Bankr. S.D. Fla. 1991). The bankruptcy schedules for the Stanfords and for APC reflect that the Stanfords and APC had mostly separate debts and liabilities, and only a few "shared liabilities." Thus, this factor does not necessarily indicate an identity of interests between the Stanfords and APC.

The remaining factors identified by counsel for the Trustee and counsel for the Defendants are fairly straightforward. Two factors that made both the Trustee's and the Defendants' lists are common ownership and common management or exclusive control. *See Herendeen v. Regions Bank (In re Able Body Temp. Servs. Inc.)*, 626 B.R. 643, 660 (Bankr. M.D. Fla. 2020) (Delano, J.). In this case Mr. and Mrs. Stanford owned all of the stock in APC at the time APC obtained the loan from the Defendants. Mr. Stanford testified that he directed APC's operations and had the

33

authority to sign checks from APC's bank accounts. Another factor addressed by Trustee's counsel concerned consolidated financial statements and difficulty separating assets. *Able Body*, 626 B.R. at 660 (considering "consolidated financial statements and balance sheets" as a factor indicating identity of interests). The Court takes judicial notice of the schedules filed in each the Stanfords' and APC's bankruptcy cases reflecting that each had separate records and assets, which would go against a finding that the two shared an identity of interests if not for the evidence that the Stanfords failed to keep their financial affairs totally separate from those of APC. *See Able Body*, 626 B.R. at 661 ("[A] corporate group may have an identity of economic interests, without finding that the separate corporations are controlled as a single entity.") The Court notes that the Stanfords' full ownership of APC and Mr. Stanford's complete control over APC would not by themselves support a conclusion that the Stanfords and APC shared an identity of interests such that what benefits one benefits the other. As argued by counsel for the Trustee, many of the factors recognized by courts that indicate an identity of interests will often be present in small business cases; however, not all small businesses that share common ownership and common management necessarily can be found to have an identity of interests. Thus, the shared ownership and management in this case does not indicate an identity of interests.

The earlier mentioned factor of commingling is the one this Court finds the most difficult to address in this case. The case law does not, in this Court's view, establish a set formula, definite criteria, or provide an objective test regarding how much commingling is reasonable in a small business (essentially a "Mom and Pop") case and that is troubling.[41] This Court is hesitant, as some

---

[41] In many cases, the two parties involved in the identity of interest analysis are two corporations, one a parent and one a subsidiary; in such a scenario, the identify of interests analysis is easier than the situation before this Court. In this case, the transfers involve individual principals and their corporation which is essentially a "Mom and Pop" business. In a Mom and Pop businesses, there may or may not be a CEO, a CFO, or a COO; but if so, those titles are generally held by the individual owners. In virtually every Mom and Pop business there is some overlap and intermingling of finances between the individual owners and the corporation. Rather than characterize all Mom and Pop businesses as sharing an identity of interests with its owners if the two have somewhat commingled their assets

Case 21-00031-TOM   Doc 155   Filed 08/04/26   Entered 08/04/26 15:39:35   Desc Main
Document     Page 34 of 39

case law suggests, to merely conclude that if there was commingling, without any quantification, that there was an identity of interests. In this case, was there commingling of some funds between the Stanfords and APC? Yes, but how much and how often, and was it enough to conclude that there is an identity of interests? Should the amount of funds commingled or the number of checks or transfers from APC to the Stanfords be some percentage of the totals before an identity of interests is present? Because the Court was unable to glean any guidance from the cases as to how much and what type of commingling is sufficient to create a conclusion that an identity of interests exists, this Court will approach the issue by focusing its analysis of the commingling factor on the specific transaction at issue.

Mr. Stanford, acting for himself and as CEO and President of APC, made the decision to enter into this loan, to execute the personal guaranty, and to mortgage the Florida Condo. His decision to consummate this deal suggests that he looked at this loan as a joint venture between and co-obligation of APC, his wife, and himself. The Stanfords' and APC's assets, including the Florida Condo, were completely commingled in this transaction and they incurred a significant joint liability – there were no guard rails or separateness between APC and the Stanfords in this particular deal. Thus, if the Court concentrates its identity of interests analysis on this transaction, the way it was structured and the way the Stanfords seemingly treated at least some loan proceeds as belonging to them and APC equally, it appears that the Stanfords' and APC's assets and liabilities were completely commingled and the two did not have separate identities. This commingling in this particular transaction supports a finding of identity of interests between the Stanfords and APC.

---

and share some liabilities, this Court must focus on the specific facts and totality of the circumstances in each case and transaction.

Additionally, the Defendants argue the joint and several liability of the Stanfords and APC supports a finding of identity of interests. The Stanfords and APC had joint and several liability for this loan, and as noted herein, the Stanfords and APC were treated as one and the same for purposes of this transaction. The Defendants were unwilling to extend a loan to APC without a guaranty from the Stanfords, and the Stanfords' willingness to incur this joint liability and to mortgage their perhaps only unencumbered valuable personal asset, namely the Florida Condo, for the sake of keeping APC alive, strongly indicates that the Stanfords and APC shared an identity of interests.

The Court notes that its analysis of identity of interests is based on the evidence presented. While it is not possible to clearly determine and define whether the Stanfords and APC shared an identity of interests throughout APC's long existence, it appears clear that the Stanfords and APC shared an identity of interests for this particular transaction. As to this entire loan transaction, the Stanfords, especially Mr. Stanford, appears to have made no effort to keep their individual financial affairs separate from those of APC. This intermingling by Mr. Stanford of his personal financial affairs with those of APC to obtain this loan is unfortunately the cause of any harm the creditors might suffer as a result of Mr. Stanford's own actions.[42]

It further appears to the Court that it must weigh and balance two somewhat competing principles. On one hand, the cases direct a finding of identity of interest where there is sufficient commingling, lack of separateness, and similar factors so that what benefitted APC also benefitted the Stanfords; thus the transfer created reasonably equivalent value, meaning the Defendants avoid any liability as if the loan was made to co-obligors. On the other hand, fraudulent transfer law is intended to ensure that, as in this case, the Stanfords' assets and estate are preserved for the benefit

---

[42] Mr. Denaburg testified that Mr. Stanford was optimistic about the prospect of keeping APC alive, even when it should have been clear that in the end APC could not have been saved.

of their creditors and not depleted by the Debtors' transfer of property or assets for the benefit of a third party that, in this case, is APC.

In weighing these two principles, this Court must conclude that ultimately the Stanfords' creditors suffered little, if any, harm from the transfers.[43] The depletion or diminution in the Stanfords' bankruptcy estate if the transfer is deemed to have been made for reasonably equivalent value, and thus not avoidable by the Trustee, will have a minimal net effect on their bankruptcy estate. Specifically, whether the Stanfords had the unencumbered Florida Condo to liquidate as of the filing of the case, or whether the transfers are deemed avoidable and recoverable by the Trustee, the initial recovery to the Stanfords' estate would be about $275,000. This figure represents net proceeds from the sale of the Forida Condo after ordinary closing costs, less fees for the Chapter 7 Trustee and his attorneys, leaving approximately $175,000 that the Stanfords' estate might net.[44] This Court's claim register reflects claims filed in excess of $12,000,000 in the Stanfords' bankruptcy case. The unsecured deficiency balance owed to Servis1st alone is over $7,000,000 (Claim No. 6-4). After payment of administrative expense claims and priority claims,[45] there would likely be no funds from the sale of the Florida Condo remaining for the benefit of unsecured claimants. These amounts clarify that although there is a technical or by-the-books depletion of the Stanfords estate if the Court concludes that the Trustee cannot recover from the Defendants, the practical effect for the Stanfords' unsecured creditors is insignificant.

---

[43] The purpose behind the concept of avoidable transfers is generally to ensure there is "no depletion of a bankrupt's estate." *Rodriguez*, 895 F.2d at 727. Preserving a debtor's net worth prevents injury to the debtor's creditors. *Id.* Here, it appears that but for this loan transaction, the unencumbered Florida Condo (or its net sale proceeds) should have been available for the Stanfords' creditors. However, given the total of the Stanfords' liabilities and the claims filed, any net recovery after the Chapter 7 Trustee's attorney fee and the Trustee compensation would result in negligible, if any, payments to each creditor.

[44] This assumes an attorney fee to special counsel of one-third of the recovery plus Chapter 7 trustee compensation as provided by statute.

[45] The amounts per the Claims Register are approximately $37,000 and $138,000 respectively.

37

Looking at this loan transaction in its entirety, this Court concludes that an identity of interests existed between the Stanfords and APC. As a result, the Court further concludes that the Defendants have sufficiently shown that the Stanfords' received reasonable equivalent value and rebutted the lack thereof. Thus, the Court finds that although the Trustee has established that the transfers from the Stanfords to APC were fraudulent transfers under the Bankruptcy Code, because of the identity of interests between the Stanfords and APC, the Trustee is ultimately not entitled to recover from the Defendants.

**Relevance of Identity of Interests**

In this case, the testimony of Mr. Stanford, Mr. Denaburg, and Mr. Wright all indicate, and the Court finds, that APC was insolvent prior to, during, and after the transaction with the Defendants, and there is no evidence in the record to suggest otherwise. This Court must now consider whether APC's insolvency at the time of the loan makes the identity of interests argument irrelevant. In *Royal Crown Bottlers*, the court noted that at the time the debtor made a transfer that benefitted its parent, both the debtor and the parent, who shared an identity of interests, were insolvent. *Royal Crown Bottlers*, 23 B.R. at 30. Nonetheless, the court determined that "the evidence supports a conclusion of a special and significant financial benefit to the debtor from financial aid to its insolvent parent" despite that "the financial blood transfusion was shortly to prove futile." *Id.* Thus, even though both the debtor and its parent were insolvent, the court concluded that the debtor received a benefit as a result of its transfer. In this case, the Court finds and concludes that the identity of interests determination is still relevant despite the insolvency of both the Stanfords and APC. The Court has determined and found that in this proceeding, the Stanfords, sharing an identity of interests with APC, benefitted from the loan to APC even though "the financial blood transfusion" was short-lived.

38

## VI. <u>CONCLUSION</u>

The Stanfords made transfers to the Defendants by way of their guaranty, the mortgage of their unencumbered Florida Condo, and their payoff of the loan made to APC. These transfers were fraudulent transfers under Bankruptcy Code § 548, and while the usual defenses afforded to defendants under Bankruptcy Code §§ 550 and 548(c) would not have shielded the transfers from recovery by the Chapter 7 Trustee, under the specific facts of this case, the Stanfords' transfers to the Defendants are not recoverable. The Stanfords and APC, in large part due to the Stanfords' failure to keep their personal financial affairs regarding this loan transaction separate from those of APC, shared an identity of interests such that the benefit for APC from the loan proceeds also benefitted the Stanfords, even though only temporarily. Although the loan from the Defendants was made at a time both APC and the Stanfords were insolvent, and although the loan did not ultimately keep APC alive, both the Stanfords and APC benefitted from the use of the loan proceeds as APC continued to briefly operate. The specific facts of this case involving this loan transaction necessitate a conclusion by this Court that the Stanfords and APC shared an identity of interests, which provided the Stanfords with reasonably equivalent value for their transfers, thereby preventing recovery of the transfers by the Chapter 7 Trustee despite that both the Stanfords and APC were insolvent at the time of the transfers. It is therefore

**ORDERED, ADJUDGED,** and **DECREED** that the relief requested by the Chapter 7 Trustee is **DENIED** and a Judgment for the Defendant is **GRANTED.**

Dated: August 4, 2026

/s/ Tamara O. Mitchell
TAMARA O. MITCHELL
United States Bankruptcy Judge

TOM/dgm

39